Filed 6/25/26  P. v. Bishop CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B344962 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA060882) |
| v. | |
| GREGORY BISHOP, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Alison Matsumoto, Judge.  Affirmed.

Bess Stiffelman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Steven E. Mercer, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

In 1996, Gregory Bishop was convicted of numerous counts of kidnapping for sexual purposes, and forcible rape, sodomy and oral copulation while acting in concert. He was 17 years old at the time of the heinous offenses. The trial court sentenced him to 166 years in state prison.

In 2023, Bishop filed a petition for recall of sentence under Penal Code section 1170, subdivision (d).[1] Under that statute, the trial court must recall and resentence a petitioner if it finds by a preponderance of the evidence that at least one of four qualifying circumstances is satisfied. Following a hearing, the trial court denied the petition, finding that Bishop did not meet his burden. Specifically, the court found that Bishop failed to establish that he had performed acts that tended to indicate rehabilitation or the potential for rehabilitation. (§ 1170, subd. (d)(2)(D).)

On appeal, Bishop argues the trial court erred when it found he did not establish the qualifying circumstance. In addition, Bishop asserts an ineffective assistance of counsel claim for failure to raise the qualifying circumstance that he committed the offenses with at least one adult codefendant. (§ 1170, subd. (d)(2)(C).) We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

I. *Prosecution's Evidence*

On our own motion, we take judicial notice of the appellate opinion in *People v. Bishop* (Aug. 28, 1998, B106688) [nonpub. opn.]. The following facts are taken directly from the opinion.

---

[1] All further statutory references are to the Penal Code.

2

a.  *The Attacks Against Sandra E.*

Shortly after 8:00 p.m. on December 25, 1991, Sandra E. returned home from the laundromat and honked her car horn hoping someone would come out and help her with the laundry.  Two men walked toward her on the sidewalk.  The taller man grabbed her from behind, put his hand over her mouth, and put a gun to her left temple.

The taller man pulled Sandra into an alley by the side of the house.  He told the shorter man, whom Sandra identified as Bishop, to search her bra and panties for money.  As Bishop searched Sandra while the taller man held the gun to her head, she noticed Bishop's face was swollen and one of his eyes was smaller than the other.  The taller man then gave Bishop the gun, which he pointed at Sandra's head, while the taller man searched her.

The taller man told Bishop to search Sandra's car; Bishop did so and said there was nothing in the car.  The taller man took Sandra's car keys and told Bishop to bring the car to the alley.  The taller man pushed Sandra into the front seat and put a sweater from the laundry over her eyes.  After they drove for about five minutes, the taller man removed the sweater from her eyes.  She saw that they were in another alley.

The taller man, who still had the gun, pulled Sandra from the car and pushed her against a wall.  He called Bishop "Pee Wee," and said they would take her into the house.  Bishop said they could not because his grandmother was there.  The taller man pulled Sandra toward the car, opened her blouse, pulled down her pants, and gave the gun to Bishop.  The taller man raped her.  Bishop said, "'Hurry up.'"  The taller man pushed Sandra into the car and raped her again.  Bishop said, "'Hurry up, I want my turn.'"  When the taller man finished, Bishop threw Sandra to the ground and raped her.

Bishop took some of the laundry from the back seat of the car and wiped off the steering wheel.  The taller man told Sandra that if she called

3

the police, he would kill her and her family because he knew where she lived. Bishop said he was leaving, and the taller man said he could, so Bishop walked up the alley. The taller man, still holding the gun, pushed Sandra back into the car and tied a sweater around her eyes. He got in the car and drove for a few minutes. She felt the car stop and heard the door open. When she pulled off the blindfold, she saw that she was at 47th Street and St. Andrews. She drove home.

When Sandra arrived home, she asked her mother to call her husband. He rushed home and then they both went to the police station where Sandra was interviewed by a police officer. She told the officer that one of the suspects had a bruised or swollen face. The officer took Sandra to the hospital. A sexual assault examination was performed at about 1:00 a.m. on December 26, 1991. Blood, urine, and vaginal samples were obtained, a pubic combing was conducted, and Sandra's clothes were collected. She complained of pain to her head, neck and back. The examining doctor found redness and superficial lacerations around her vagina consistent with forcible sex.

On February 3, 1992, Sandra was shown two photographic six-packs by the police. She wrote on the back of the card that "number 5 [Bishop's photograph] 'looks an awful lot as the man that attacked me.'" Sandra also identified Bishop at the preliminary hearing.


b. *The Attacks Against Maria C.*

At about 6:30 a.m. on January 24, 1992, Maria C. was standing at the bus stop at the corner of Vernon Avenue and St. Andrews Place, near her home. Maria saw two males approaching.

The taller man wore a black jacket with a hood that covered his forehead and which was zipped up to his lip. The shorter man was wearing a

4

black sweatshirt, dark pants, and gloves. His face was covered by a thick stocking that had holes for his eyes, nose, and mouth. Maria estimated that the taller man was 18 to 19 years old, and the shorter man was 17 to 18 years old.

The shorter man grabbed Maria by the hair and put a gun to her left temple. The shorter man told Maria that this was a sexual attack. While the taller man stood watch, the shorter man, holding a gun, pulled Maria into an alley. Maria held onto a fence while the shorter man tried to pull her into a yard; he then put the gun in her mouth. The shorter man pulled her by the hair, and the taller man pushed her up the stairs into a house. One of the men hit her on the head behind her left ear.

Inside the house, both men removed her clothing. The shorter man grabbed her by the hair and pulled her to a bed, while the taller man stood at the door as a lookout.

The shorter man got on top of her and hit her on the left cheek with the gun. The shorter man then put his fingers in Maria's vagina, then his penis, continuing to hold the gun in his hand. He then sodomized her and raped her again. The shorter man forced her to orally copulate him twice. The shorter man then stood at the door while the taller man took Maria to the bed and raped her. He sodomized her, then raped her again. He forced her to orally copulate him. He raped her again. With Maria on the bed, the shorter man again put his penis in her vagina and tried to kiss her.

The shorter man got up and went through Maria's purse. He found a police officer's card in her purse. The men said that they would kill her if she called the police. They took her immigration card and said she would be deported.

5

While the shorter man held the gun, both men forced Maria to orally copulate them simultaneously.

The men said they were going out to bring back some food, and that they would kill her if she left. They left, taking her clothing. The shorter man returned shortly thereafter and threw her underwear then her dress at her. She put her dress on when she saw them walking down the alley, then walked home.

When she arrived home, her mother, sister and brother-in-law were there. They called the police, and paramedics took Maria to the hospital. A sexual assault examination was performed, including collection of blood, vaginal, oral and rectal samples, and pubic combings. Her clothing was collected. Maria reported head, chest, and abdominal pain. The left side of her head was swollen, and she had blood stains on her face, inner thigh, underwear and dress. She had a hematoma on the left side of her head. She had secretions on her left inner thigh. Her hymen was lacerated, and she had a hematoma on the left portion of her hymen. She also had a laceration in the area between her vagina and rectum, and rectal bleeding.

Maria was shown a photographic lineup but was unable to identify anyone because the attackers covered their faces and her eyes.

c. *Other Evidence*

Regina Williams testified that she knew Bishop because her oldest brother was a friend of his. She knew Bishop as "Pee Wee" and "Hot Dog." Bishop lived on 43rd Place near Western Avenue. Williams stated she and Bishop would hang out at the same house on 45th Place nearly every day. She last saw Bishop on December 28, 1991. Williams testified that Bishop had a "messed up" eye.

Blood typing and DNA evidence connected Bishop to the victims.

II.    *Conviction and Sentence*

In 1996, a jury found Bishop guilty of two counts of kidnapping for sexual purposes (former § 208, subd. (d) [now § 209], counts 2 & 6), nine counts of forcible rape while acting in concert (§ 264.1, counts 3, 5, 8, 9, 11, 14, 15, 18, & 22), two counts of forcible sodomy while acting in concert (§ 286, subd. (d), counts 10 & 16), and five counts of forcible oral copulation while acting in concert (§ 288a, subd. (d), counts 12, 13, 17, 23, & 24).[2]  As to counts 2, 3, 5, 6, 14 through 18, and 24, the jury found true the allegation that Bishop personally used a handgun (§ 12022.5, subd. (a)).  As to counts 3, 8 through 13, 22, and 23, the jury found true the allegation that Bishop used a handgun in the commission of these offenses (§ 12022.3, subd. (a)).  As to counts 3, 5, 8 through 18, and 22 through 24, the jury found true the allegation that Bishop kidnapped the victims for the purpose of committing a sexual offense (§ 667.8, subd. (a)).  As to counts 8, 9, and 11, the jury found true the allegation that Bishop inflicted great bodily injury (§ 12022.8).  The trial court sentenced Bishop to 166 years in state prison.

In 1998, a different panel of this division affirmed the judgment on appeal.

III.    *Petition for Recall*

In 2023, Bishop filed a petition for recall of sentence pursuant to section 1170, subdivision (d)(1).  Bishop alleged that he was 17 years old at the time of the offenses, the trial court imposed a de facto life without parole

_____

[2]    Counts 2, 3, and 5 were committed against victim Sandra E.  Counts 6, 8 through 18, and 22 through 24 were committed against Maria C.

7

(LWOP) sentence, and he had been incarcerated for at least 15 years. In addition, he attached " 'statement[s] describing [his] remorse and work towards rehabilitation.' " These statements were undated apology letters expressing remorse to each victim and the trial court. Bishop asserted he demonstrated, by a preponderance of the evidence, he had performed acts that tend to indicate rehabilitation or the potential for rehabilitation.

In opposition, the People contended Bishop failed to establish he was entitled to relief because he was not sentenced to LWOP. In any event, the People argued Bishop failed to establish he had performed acts indicating rehabilitation or potential for rehabilitation because he accrued "several" rule violation reports while incarcerated. Also, Bishop never disclosed the identity of his accomplice in his commitment offenses.

Although section 1170, subdivision (d) does not require that the trial court hold a hearing before ruling on a petition (see § 1170, subd. (d); *People v. Harring* (2021) 69 Cal.App.5th 483, 498 & fn. 5 (*Harring*)), the trial court heard the matter on March 3, 2025. At the hearing, defense counsel argued Bishop's sentence of 166 years was a de facto LWOP sentence, and he was entitled to relief. The People submitted on their papers. The court agreed with defense counsel that Bishop's sentence was the functional equivalent of LWOP. The court acknowledged the three apology letters attached to Bishop's petition and stated that "no other information [was] attached."[3] Based on "the information submitted," the court found, by a preponderance of the evidence, that Bishop had not performed acts that tended to indicate

---

[3]     The court "reviewed the [prison's] 'C' file," but noted that it was "not really relevant to these proceedings." The court went on to state that the prison file indicated that Bishop had two parole suitability hearings, one in 2015 and another in 2022. At both hearings, Bishop was denied parole.

rehabilitation or the potential for rehabilitation. (§ 1170, subd. (d)(2)(D).)
Therefore, the court denied the petition.

Bishop timely appealed.

## DISCUSSION

I.    *Legal Principles and Standard of Review*

The United States Supreme Court held in *Graham v. Florida* (2010)
560 U.S. 48 (*Graham*) that the Eighth Amendment's ban against cruel and
unusual punishments does not permit the imposition of a sentence of LWOP
for a juvenile offender convicted of a nonhomicide crime. In response to
*Graham*, our Legislature enacted Senate Bill No. 9 (effective Jan. 1, 2013),
which amended section 1170 by adding former subdivision (d)(2), (now
subdivision (d)(1)).[4] Section 1170, subdivision (d) created a procedural
mechanism for a juvenile offender sentenced to LWOP to petition for recall
and resentencing to a term of parole. (*In re Kirchner* (2017) 2 Cal.5th 1040,
1049 (*Kirchner*).)

Section 1170, subdivision (d) states: "When a defendant who was under
18 years of age at the time of the commission of the offense for which the
defendant was sentenced to imprisonment for [LWOP] has been incarcerated
for at least 15 years, the defendant may submit to the sentencing court a
petition for recall and resentencing." (§ 1170, subd. (d)(1).) Bishop makes the
necessary threshold argument that he was sentenced to a term that is the
functional equivalent of LWOP and therefore may seek section 1170,
subdivision (d) relief. (See *People v. Sorto* (2024) 104 Cal.App.5th 435, 450–
454; *People v. Heard* (2022) 83 Cal.App.5th 608, 622–626.) The Attorney

---

[4]    Effective January 1, 2022, the Legislature redesignated section 1170,
subdivision (d)(2), to section 1170, subdivision (d)(1). (Stats. 2021, ch. 731,
§ 1.3.)

General does not dispute that Bishop's sentence is the functional equivalent of LWOP for purposes of eligibility for section 1170, subdivision (d) relief.

Section 1170, subdivision (d) also sets forth certain pleading requirements for a petition for recall and resentencing. The defendant must file the petition with the sentencing court. (§ 1170, subd. (d)(2).) The petition must include: (1) a "statement that the defendant was under 18 years of age at the time of the crime and was sentenced to life in prison without the possibility of parole"; (2) a "statement describing [the defendant's] remorse and work towards rehabilitation"; and (3) a "statement that one" or more of four qualifying circumstances is true. (*Ibid*.) The relevant qualifying circumstances occur when: "[t]he defendant committed the offense with at least one adult codefendant" and "[t]he defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing themselves of rehabilitative, educational, or vocational programs, ... using self-study for self-improvement, or showing evidence of remorse." (§ 1170, subd. (d)(2)(C), (D).) The Attorney General does not dispute that Bishop met these pleading requirements.

However, a facially sufficient pleading does not entitle a defendant to recall of his sentence and a resentencing hearing. The trial court must then decide by a preponderance of the evidence whether the alleged qualifying circumstance is true. (§ 1170, subd. (d)(5).) If the trial court finds one or more qualifying circumstances true, the defendant's sentence must be recalled for a resentencing hearing. (*Kirchner, supra*, 2 Cal.5th at p. 1049; see § 1170, subd. (d)(7).)

We review the trial court's factual determinations for substantial evidence, and its interpretation and application of the statute to those factual findings de novo. (*Harring, supra,* 69 Cal.App.5th at p. 502.)

10

II.   *Rehabilitative Acts*

Bishop contends he has met his burden of demonstrating that he performed acts tending to indicate rehabilitation or the potential for rehabilitation.  (§ 1170, subd. (d)(2)(D).)  As discussed above, a defendant can demonstrate rehabilitative acts by "showing evidence of remorse."  Bishop asserts that his apology letters to the victims and the trial court were sufficient to satisfy the requisite showing under the statute.[5]

We find *People v. Gibson* (2016) 2 Cal.App.5th 315, 325 (*Gibson*) instructive.  In *Gibson*, the defendant filed a petition for recall of his sentence pursuant to section 1170, subdivision (d).  (*Gibson, supra,* 2 Cal.App.5th at p. 322.)  The defendant submitted numerous certificates and documents in support of his rehabilitative efforts, the great majority of which were created after the enactment of Senate Bill No. 9.  (*Id.* at p. 328.)  Following a hearing, the trial court denied the petition on the grounds that the defendant failed to demonstrate he had been rehabilitated or that he was remorseful.  (*Gibson, supra,* 2 Cal.App.5th at p. 322.)  The trial court found the "defendant's statements of remorse and work towards rehabilitation were neither credible nor adequate given the length of time defendant had to work on those issues."  (*Id.* at p. 328.)  The court further found that the "defendant's statements of

---

[5]   Bishop asserts for the first time on appeal that the prison file (or "C-file") demonstrated his various acts of rehabilitation.  Bishop did not attach the prison file to his petition or argue at any point prior to this appeal that the file contained evidence that would illustrate rehabilitative acts.  The only evidence of rehabilitation (which includes remorse) that Bishop provided to the trial court was the apology letters.  Therefore, Bishop forfeited this argument by failing to raise it below.  (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.)  We also note that the trial court referenced the prison file at the hearing for the sole purpose of documenting Bishop's prior parole hearings, which the court found were "not really relevant" to the proceedings.  Moreover, the People were the only party to utilize the prison file, for the purpose of opposing Bishop's petition.

remorse were not believable and that he made excuses for his behavior." (*Ibid*.) The appellate court affirmed the order, holding that "the majority of [the] defendant's efforts at rehabilitation ... postdate the enactment of Senate Bill [No.] 9," and "[a] trier of fact could reasonably conclude that [the] defendant's efforts were not reflective of genuine remorse or rehabilitation." (*Id*. at pp. 328–329.)

Here, the court noted the only evidence presented by Bishop was three undated apology letters. We agree with the Attorney General that Bishop's evidence of remorse was "fundamentally an issue of credibility." As argued by the Attorney General, Bishop never disclosed the name of the individual who committed these heinous sexual offenses with him. Based on Bishop's 30-year refusal to disclose the identity of his accomplice, the trial court could reasonably doubt his recently professed remorse. Also, the undated apology letters were presumably prepared in 2023 in support of his petition for recall. As articulated in *Gibson*, the apparent timing of the letters suggests a self-serving quality to Bishop's purported remorse. The trial court was clearly not persuaded that his statements of remorse were genuine. (See *Gibson, supra,* 2 Cal.App.5th at pp. 328–329.) We conclude that Bishop failed to meet his burden under section 1170, subdivision (d)(2)(D).

Bishop argues that *Gibson* is no longer persuasive authority because the Legislature subsequently amended section 1170, subdivision (d), by enacting Senate Bill No. 1084 (SB 1084), effective January 1, 2017. The changes to the statute do not affect our analysis. "According to the author, 'SB 1084 makes technical non-substantive changes to the provisions allowing a person who was under 18 years of age when sentenced to [LWOP] to submit a petition for resentencing. [Thus,] [t]he bill clarifies language that has caused some confusion in the courts.'" (Assem. Com. on Appropriations,

analysis of Sen. Bill No. 1084 (2015-2016 Reg. Sess.) as amended Aug. 1, 2016, p. 4.) Contrary to Bishop's contention, SB 1084 did not "make recall mandatory upon the filing of a sufficient petition." The trial court was still required to make the requisite finding by a preponderance of the evidence that the defendant's statement (i.e., qualifying circumstance) was true prior to recalling his or her sentence. SB 1084 simply "[clarified] that, if the court finds by a preponderance of the evidence that one or more of the statements in the petition is true, the court must recall the sentence and commitment." (Assem. Com. on Appropriations, analysis of Sen. Bill No. 1084 (2015-2016 Reg. Sess.) as amended Aug. 1, 2016, p. 1.) Therefore, the passage of SB 1084 does not affect our reliance on *Gibson*.

III.   *Ineffective Assistance of Counsel*

In a perfunctory fashion, Bishop asserts an ineffective assistance of counsel claim for failing to raise another qualifying circumstance in his petition for recall under section 1170, that "[t]he defendant committed the offense with at least one adult codefendant." (§ 1170, subd. (d)(2)(C).) In order to succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate a reasonable probability of a more favorable result absent counsel's allegedly deficient conduct. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) Here, Bishop cannot demonstrate that his accomplice was a "codefendant" as he was never identified, let alone charged or prosecuted. And because Bishop's accomplice was never identified, there is no evidence that he was in fact an "adult." Maria's guesstimate that the accomplice was "around 18 or 19 years old" is insufficient to establish that he was an "adult." We therefore conclude Bishop has not established a reasonable probability that he would have obtained a more favorable result in the trial court.

13

DISPOSITION

The trial court's order denying Bishop's petition for recall of sentence under section 1170, subdivision (d) is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ZUKIN, P. J.

WE CONCUR:


TAMZARIAN, J.


COGLIATI, J.*

---

*Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14